NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 05a0357n.06
Filed: May 5, 2005

No. 03-1830

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SUSAN BUREAU; CHARLES BUREAU )
)
    Plaintiffs-Appellants, )
)
    v. )    ON APPEAL FROM THE UNITED
)    STATES DISTRICT COURT FOR
)    THE
STATE FARM FIRE AND CASUALTY )    EASTERN DISTRICT OF MICHIGAN
COMPANY, )
)
    Defendant-Appellee. )
)
)

_____

BEFORE:    BATCHELDER and COLE, Circuit Judges; RUSSELL, District Judge[*]

        RUSSELL, District Judge.    Plaintiffs-Appellants Charles and Susan Bureau

("Bureaus") filed suit in Michigan state court seeking additional benefits under their homeowner's

policy after Defendant-Appellee State Farm Fire and Casualty Company ("State Farm") denied

coverage for repairs necessitated by mold damage to their home. State Farm removed the case to

federal court, where the case was tried to a jury, which found in State Farm's favor. After the

verdict, the Bureaus moved for judgment as a matter of law or for a new trial, arguing that the

_____

    [*]Honorable Thomas B. Russell, United States District Judge for the Western District of
Kentucky, sitting by designation.

1

verdict was against the weight of the evidence. The district court denied this motion, and the Bureaus now appeal that denial as well as the district court's denial of their motion to exclude the testimony of State Farm's expert Michael Neuman.

## BACKGROUND

In 1999, the Bureaus bought a home in Harrison Township, Michigan, and as a necessary condition of their mortgage financing, they obtained homeowner's insurance from State Farm. The policy specified that it did not provide coverage for lack of maintenance or losses due to mold, unless the mold resulted from a covered loss. In August, 2000, a thunderstorm damaged the roof and caused water damage throughout the house for which the Bureaus filed a claim with State Farm. State Farm sent an adjuster to inspect the damage, who noted storm damage to the ceilings of several rooms, but no damage to walls or floors and no mold. Accordingly, State Farm paid the Bureaus $1,155.30 for repairs. In January, 2001, the Bureaus filed another claim with State Farm; this claim was based on mold in the house, as well as water in the house's crawlspace and a leak in one of the bedrooms resulting from ice damming on the roof. State Farm sent a plumber to inspect the crawlspace. The plumber determined that the water in the crawlspace was caused by flooding, and State Farm denied coverage for the flooding in the crawlspace.

To investigate the mold issue, the Bureaus brought in Sanit-Air, an indoor air-quality firm, which found water and mold damage throughout the house and concluded that mold growth had rendered the house uninhabitable. Specifically, Sanit-Air found two types of mold growth: in the attic, it found a type of mold that resulted from the long-term presence of moisture, and in the living spaces of the house, it found a type of invasive mold that resulted from short-term

2

moisture presence. Sanit-Air concluded that the invasive mold growth was a result of the water damage sustained during the August, 2000 thunderstorm.

State Farm brought in a firm named Soils and Materials Engineering ("SME") to investigate the existence and cause of the mold. James Less, one of SME's air-quality experts, examined the house and reached the same conclusions as Sanit-Air *except* that he concluded that the mold in the living areas of the house, although it was a different type from that in the attic, was nevertheless a result of the leaking roof and *not* the August storm. SME then sent Michael Neuman, a structural engineer, to examine the house. He visually inspected the roof and attic and concluded that the roof should have been replaced several years earlier, and that the delay in its replacement was a significant factor in the mold growth. In light of this, State Farm determined that the mold growth was not the result of a covered event, and denied coverage. The Bureaus brought suit seeking coverage; the parties agreed that the August, 2000 thunderstorm was a covered event, but State Farm asserted that the mold growth resulted from defect or failure to repair the roof, not the thunderstorm. The jury found in State Farm's favor, and the Bureaus filed a timely motion for judgment as a matter of law or for a new trial, which the district court denied. This appeal followed.

## ANALYSIS

### A. Motion to exclude expert testimony

In addition to the denial of the motion for judgment as a matter of law or for a new trial, the Bureaus appeal the district court's denial of their motion to exclude the testimony of Michael Neuman. Mr. Neuman was the structural engineer employed by SME who concluded that the leaking roof led to moisture problems throughout the house, which was a necessary condition for

the mold growth in the living spaces. Mr. Neuman did not give an opinion specifically on the issue of what caused the mold in the living spaces. The motion to exclude Mr. Neuman's testimony was based on Fed. R. Evid. 702 and the rules set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

We review the district court's decision to admit expert testimony under Rule 702 and *Daubert* for abuse of discretion. *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir. 1998) (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)); *United States v. Jones*, 107 F.3d 1147, 1151 (6th Cir. 1997). "An abuse of discretion occurs when we are left with the definite and firm conviction that the [district] court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard." *U.S. v. Haywood*, 280 F.3d 715, (6th Cir. 2002), citing *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000) (internal quotation marks omitted). The standard of review for *whether* the district court abdicated its *Daubert* gatekeeping role, however, is de novo. *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000); *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087-88 (10th Cir. 2000).

We begin with the latter determination: whether the district court abandoned the gatekeeping role prescribed by *Daubert* and its progeny. Our review of the record reflects that it did not. In *Daubert*, the Supreme Court said that "[f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. 579, 592 (1993). "Although *Daubert* specifically dealt with 'scientific' evidence, we have recognized that the 'gatekeeper' analogy 'is applicable to all expert testimony

4

offered under Rule 702.'" *First Tennessee Bank National Association v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (quoting *United States v. Thomas*, 74 F.3d 676, 681 (6th Cir. 1996), *abrogated on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1996)).  Accordingly, the district judge is generally required to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589.  In determining reliability, the Supreme Court further noted four non-exhaustive factors the district court may use in determining the reliability of scientific expert testimony: (1) whether a theory has been tested; (2) whether it has been subject to peer review; (3) whether a technique has a potential rate of error, or standard operating procedures; and (4) whether a theory is generally accepted within the scientific community.  *See id.* at 592-94.  In *Kumho Tire Co., Ltd.,* the Supreme Court explicitly extended the *Daubert* gatekeeping role to technical or other specialized expert testimony.  *See Kumho Tire Co., Ltd.,* 526 U.S. at 141, 147-49.  The Supreme Court further noted that *Daubert's* four factors for determining scientific reliability  need not be applied in all cases.  "Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether  particular expert testimony is reliable." *Id.* at 152.  The Supreme Court also noted that the trial judge must have "discretionary authority [] both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Id.*

The Bureaus argue that "in summarily denying Plaintiffs' motion to preclude Michael Neuman's testimony, the trial court erroneously failed to perform its gatekeeping role." (Appellant's br. at 25.)  The Bureaus argue that Mr. Neuman's opinions were not relevant

5

because the issue in the case was whether the mold in the living areas was caused by the August, 2000 thunderstorm and Mr. Neuman's only opinion was "that a poor roof and inadequate attic ventilation caused chronic moisture in the attic." (Appellant's br. at 29.) Also, the Bureaus argue that Mr. Neuman's testimony was not reliable because Mr. Neuman is not qualified to testify as a mold expert, and that his visual inspection of the roof was insufficient to allow him to testify as an expert on structural engineering issues. The Bureaus further argue that Mr. Neuman was unreliable regarding the length and extent of water infiltration through the roof because "there is no authoritative text that he can identify to state that the water staining he found in the attic was more than five (5) years old, and that there is no peer reviewed scientifically valid work that would allow him to determine how long the roof had allegedly been leaking." (Mot. to Preclude Testimony of Michael Neuman, J.A. at 124.) After reviewing the brief and deposition of Mr. Neuman, the district court summarily denied the Bureaus' motion at a hearing. The Bureaus argue that this denial represents an abandonment of the district court's gatekeeping role. As support, the Bureaus assert that some courts have held that *Daubert* requires "specific findings or discussion on the record" so that the appellate court can determine whether the district court "carefully and meticulously review[ed] the proffered scientific evidence." *Goebel,* 215 F.3d at 1088; *see also Kumho Tire Co., Ltd.,* 526 U.S. at 158-59 ("trial court discretion in choosing the manner of testing expert reliability – is not discretion to abandon the gatekeeping function") (Scalia, J., concurring).

The record and case law indicate that the district court did not abuse its discretion in admitting the expert testimony of Mr. Neuman. As an initial matter, it is incorrect to argue that the district court "refused" to consider the *Daubert* motion or the qualifications and proposed

6

testimony of Mr. Neuman. The district court itself notes that it thoroughly reviewed the *Daubert* motion and the appended deposition transcript. During the hearing, the district court was also conversant about the specifics of the proposed testimony. Furthermore, the comments regarding Mr. Neuman's expert testimony indicate that the district court felt, given Mr. Neuman's methods, he was competent to testify for the limited purpose of the condition of the roof. After specifically noting that the Mr. Neuman's testimony was weak, the district court then noted that all he did was "eyeball things." That court then noted it was "undisputed" that his testimony was solely related to the roof. (Hearing Tr., J.A. at 234.)

The Bureaus also overstate their case by arguing that specific findings as to reliability are required under *Daubert.* The Supreme Court clearly indicates that such findings are not necessary where reliability is "taken for granted." *Kumho Tire Co., Ltd.,* 526 U.S. at 152; *see also* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 6266, supplement at 42 (2004) ("*Kumho* makes clear that formal gatekeeping proceedings are unnecessary where reliability is clear."). Nor are the Bureaus' other reliability arguments – that Mr. Neuman's conclusions and methodology were not subject to peer review or an authoritative text – well-founded. As noted by the Supreme Court, the district court has wide latitude in determining what factors to consider in establishing the reliability of an expert witness. *See Kumho Tire Co., Ltd.,* 526 U.S. at 152; *United States v. Demjanjuk,* 367 F.3d 623, 635 (6th Cir. 2004).

This Court has previously upheld limited comments and findings of a district court regarding the reliability of an expert's methods where such methods are relatively uncontroversial. In *Demjanjuk,* the district court presided over a lengthy *voir dire* into an expert's methodology for archival searches. *Id.* The adverse party then objected to such

7

testimony under *Daubert*. The district court stated that it would allow the expert to testify based on his qualifications and further noted that regarding methodology:

> Obviously, if a person who has been qualified as an expert ... has employed techniques in a particular case that are not as valid as other techniques might have been, those factors mitigate against the acceptance of their testimony. The Court is perfectly capable of making those determinations based upon the examination and cross-examination of the witnesses.

*Demjanjuk,* 367 F.3d at 634. This Court then noted that since archival search methods were neither "original or controversial," it was not necessary to require "peer review" or "empirical analysis." *Id.* at 634-35. This Court then held there was no abuse of discretion by admitting the expert testimony since the district court was "aware of the applicable legal standards and considered the expert's methodology in determining the weight to be attributed to the testimony." *Id.* at 635.

This case is substantially similar to *Demjanjuk*. During deposition and trial, Mr. Neuman testified solely as to his visual inspection of the roof and attic and the water-damage he found therein. Mr. Neuman did not use any sophisticated equipment during his inspection, such as a moisture meter, that would mislead the jury with the imprimatur of technical or scientific veracity. Rather, Mr. Neuman simply described the dry rot, water marks, efflorescence, missing or damaged shingles, and warped roof decking, which were supported by photographic evidence. Nor is Mr. Neuman's testimony that the structure "should have been reroofed at least five years ago" inherently misleading or unreliable given his undisputed qualifications as a construction engineer. As the district court notes, the extent to which the roof was leaky prior to the August 2 storm is relevant in determining whether moisture and water penetrated the interior of the Crocker House as a result of long-term maintenance issues, or solely as a result of August 2

8

storm.  (Order denying JMOL, J.A. at 25-27.)  In other words, given the relatively uncontroversial nature of his testimony, and the district court's knowledge of Mr. Neuman's methodology and awareness of the standard under *Daubert*, it was not error to allow the testimony.

### B. Denial of motion for judgment as a matter of law or for a new trial

The Bureaus argue that the district court erred in denying their motion for judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50.  In the alternative, the Bureaus argue that the district court erred in failing to grant a new trial under Fed. R. of Civ. P. 59, as the verdict was against the clear weight of the evidence.

This Court usually reviews a district court's decision on a motion for JMOL under Rule 50 *de novo.  K&T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 176 (6th Cir. 1996).  However, where the contested issue is one of sufficiency of the evidence, we apply the law of the forum state.  Michigan and federal law have the same JMOL standard.  Under Rule 50, a district court should grant a JMOL if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Similarly, under Michigan law, "[d]irected verdicts are appropriate only when no factual question exists upon which reasonable minds may differ." *Meagher v. Wayne State Univ.,* 565 N.W.2d 401, 409 (Mich. Ct. App. 1997) (citing *Brisboy v. Fibreboard Corp.*, 429 Mich. 540, 549, 418 N.W.2d 650 (1988)).  A district court's decision on a motion for a new trial is reviewed for an abuse of discretion.  *In re Brown,* 342 F.3d 620, 627 (6th Cir. 2003).  "In determining whether to grant a new trial when the claim is that the verdict is against the weight of the evidence, a district court must compare and weigh the opposition evidence and it must set aside the verdict if it determines that the verdict is against the clear

9

weight of the evidence." *Clay v. Ford Motor Co.,* 215 F.3d 663, 672 (6th Cir. 2000).

In this case, evidence clearly establishes that the district court did not err in denying a motion for JMOL or new trial. The Bureaus argue that since Ms. Morbach testified that AV, the mold in the living spaces, was a primary invading fungus, it was "scientifically impossible" to conclude that the mold was caused by a chronic moisture problem, and not by the August 2, 2000 storm. The Bureaus further argue that this is buttressed by State Farm's failure to present any evidence as to the cause of the mold. However, as noted by the district court, ample evidence exists to support the theory that a failure to properly maintain the roof led to moisture problems throughout the Crocker House that resulted in the mold infestation. In particular, evidence establishes that the Bureaus knew of the poor condition of the roof at the time they bought the house, knew that the roof was leaky after substantial water damage from the August 2, 2000 thunderstorm, and failed to professionally repair or replace it. State Farm's expert, Mr. Neuman, corroborates the assertion that the roof of the house was leaky and should have been replaced five years prior to the loss of the house.

Accordingly, a reasonable jury could have determined that a failure to maintain the roof, as opposed to damage caused by the August 2, 2000 storm, was the cause of the widespread moisture problem in the Crocker House, leading to a mold infestation. Moreover, given this evidence, a new trial is not warranted as the evidence clearly supports the jury's verdict..

## CONCLUSION

For the reasons set forth above, the Court **AFFIRMS** the decisions of the district court.