Filed 2/7/24  P. v. Jacobs CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD JACOBS,<br><br>    Defendant and Appellant. | B316230<br><br>(Los Angeles County<br>Super. Ct. No. NA113062) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Judith L. Meyer, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Michael C. Keller and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Edward Jacobs appeals from his judgment of conviction for count 1, the first degree murder of Guy Alford (Pen. Code,[1] § 187, subd. (a)), and count 2, possession of a firearm by a felon (§ 29800, subd. (a)).

First, Jacobs argues the trial court erred by failing to conduct a hearing pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) before admitting DNA evidence that was analyzed using STRmix, a software program that uses probabilistic genotyping to aid in the interpretation and evaluation of forensic evidence that contains a mixture of DNA from multiple contributors. We conclude the trial court did not err by failing to hold a *Kelly* hearing, because the STRmix method of DNA analysis is generally accepted by the relevant scientific community as held in *People v. Davis* (2022) 75 Cal.App.5th 694 (*Davis*).

Second, Jacobs argues there was insufficient evidence to support the jury's robbery-murder special-circumstance finding. We disagree as there was evidence Jacobs intended to rob Alford before the shooting.

Third, Jacobs argues the trial court erred when it denied his request to stay his sentence for his conviction in count 2 under section 654, because his possession of the firearm and the shooting were part of the same indivisible course of conduct. Again, we disagree as there was sufficient evidence Jacobs arrived at the scene with the handgun used to shoot Alford, and there was no evidence that fortuitous circumstances put the firearm in Jacobs's hand only at the instant of committing the murder.

---

[1] All further statutory references are to the Penal Code.

Last, Jacobs has requested an independent review of the trial court's hearing under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prosecution Evidence

#### A. The shooting

On September 26, 2018, Javontae Sorrells, Darrell Woodall, Bamm Thompson, Zatrail Greenhill, and Alford drove to a Jack in the Box on Atlantic Avenue and 52nd Street in Long Beach. Alford was driving, Thompson was in the front passenger seat, Greenhill sat in the back seat behind Thompson, Woodall sat in the back seat behind Alford, and Sorrells sat between Greenhill and Woodall.

The following description of the shooting and subsequent events is based on Alford's passengers' testimony and interviews, as well as footage captured by surveillance cameras in the Jack in the Box drive-thru and an adjacent business.

Alford pulls into the drive-thru and stops at the menu so Alford and his passengers can order. A black car then pulls into the drive-thru behind Alford. A man wearing a ski mask then exits the black car, which starts to back out of the drive-thru. As the man approaches Alford's driver-side window, two other individuals exit the black car and walk towards Alford's car. When the man who first exited the black car reaches Alford's driver-side window, he points a gun into Alford's car and says something like "gimme" or "give me the car." Alford and the man struggle over the gun, and the man fires four or five shots into Alford's car. The man then runs back to the black car and gets in along with the other two individuals. At the same time, Sorrells,

3

Woodall, Thompson, and Greenhill can be seen quickly exiting Alford's car and then running in different directions. Alford's vehicle then rolls forward slightly and then rolls backwards out of the drive-thru, striking a parked car.

After several minutes, Greenhill and Thompson return to Alford's car to get their backpacks from the trunk. Thompson tries to assist Alford, but finds him nonresponsive and not breathing. Greenhill and Thompson then open the driver-side door to pull the trunk latch to access the trunk. Greenhill and Thompson then leave the scene.

### B.    Law Enforcement Investigation

#### 1.    The crime scene

Law enforcement responded to the scene. Officers recovered cartridge casings from the driver-side floorboard and windowsill, as well as in the front driver seat after Alford's body was removed. They also recovered a watch next to the drive-thru intercom where the shooting took place.

Officers obtained the surveillance videos from the Jack in the Box and an adjacent business, which were played for the jury.

Investigators from the Los Angeles County Department of Examiner-Coroner's office determined Alford suffered a fatal gunshot wound to the left side of his neck, and suffered additional gunshot wounds to his torso and right leg.

Firearms evidence showed the cartridge casings were fired from the same gun.

#### 2.    DNA evidence

A forensic specialist processed the crime scene, photographing the drive-thru and surrounding area, as well as collecting DNA swabs from the watch found by the intercom,

4

Alford's hands, and the interior panel and exterior of Alford's driver-side door.

A criminalist tested the swabs for DNA. She explained DNA testing consists of four steps: extraction, quantitation, amplification, profiling using a genetic analyzer, and interpretation. Extraction involves purifying the DNA by separating the DNA from collected cells. Quantitation involves determining how much DNA is in a particular sample, which is critical to testing because if there is not enough DNA, the criminalist will be unable to create a DNA profile for comparison. Amplification involves making millions of copies of those locations on the DNA samples that are unique to each individual. Then, to create a profile for interpretation, the criminalist separates out the amplified fragments of DNA and enters them into a genetic analyzer for comparison.

To assist in the interpretation of the DNA profile, the criminalist uses STRmix, a software program that helps interpret a DNA sample that contains a mixture of DNA from multiple contributors. STRmix uses probabilities to come up with an expected profile from the observed profile expressed in the form of a "likelihood ratio." The likelihood ratio is a statistical measure of the probability that certain individuals contributed to a mixed-source DNA sample against the probability that other, unrelated individuals were the contributors. In other words, it expresses the weight of the observed profile in two mutually exclusive hypotheses, i.e., the probability that the evidence originated from the suspect in the case versus the probability that the evidence originated from an unknown and unrelated individual.

Here, the criminalist determined the watch found at the scene had a total of four contributors. Jacobs's profile was included in the mixture and most aligned with the 80 percent contributor. The likelihood ratio of the DNA profile from the watch was approximately three times 10 to the 30th power more likely if it originated from Jacobs and three unknown individuals, than if it originated from four unknown individuals.

Alford's left hand fingernails sample had a mixture of four contributors. Jacobs's profile was included and most aligned with the five percent contributor. Alford's profile was most aligned with the 84 percent contributor. The likelihood ratio was "approximately 312 and 93 times more likely" that it originated from Alford, Jacobs, and two unknown individuals than if it originated from Alford and three unknown, unrelated individuals.

The interior door panel sample had a mixture of four contributors, including Alford. Jacobs's profile was included and most aligned with the 8 percent contributor. Alford's profile aligned with the 67 percent contributor. The likelihood ratio was approximately nine million times more likely if it originated from Alford, Jacobs, and two unknown individuals than if it originated from Alford and three unknown, unrelated individuals.

The exterior door sample had a mixture of four contributors. Jacobs's profile was included and aligned with the 20 percent contributor. The likelihood ratio was approximately 4,180 times more likely that it originated from Jacobs and three unknown individuals than if it originated from four unknown individuals.

## II.    Defense Evidence

Defense counsel called Thompson to testify.  Thompson said Alford picked him and the other passengers up approximately an hour and a half before the shooting.  Thompson testified their plan was to smoke weed, eat, and then go home.  They drove to a Jack in the Box near Thompson's house and entered the drive-thru.  Thompson said the passengers were taking their time ordering, and that Thompson was the only person who got his order out.  As he was ordering, Thompson saw a man walk up to the driver side of the car and put a gun in the car and start shooting.  Thompson saw Alford and the gunman struggle for the gun before he heard the gunshots.  Thompson did not hear the gunman say anything before shooting.  Immediately after the shooting, Thompson fled, but then returned to Alford's car approximately three to four minutes later to check on Alford and to retrieve his things.

## III.    Jury Verdict and Sentencing

The jury found Jacobs guilty of count 1, first degree murder (§ 187, subd. (a)) and count 2, possession of firearm by a felon (§ 29800, subd. (a)(1)).  It also found true the robbery-murder special-circumstance and that Jacobs personally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)–(d)).  The jury also found the prior conviction allegations to be true.

The trial court sentenced Jacobs to life without the possibility of parole plus 29 years to life.  The court struck the two five-year prior serious felony conviction enhancements but denied Jacobs's request to stay his sentence for count 2 under section 654.

Jacobs appealed.

7

## DISCUSSION

### I. The trial court did not err in failing to hold a *Kelly* hearing before admitting the DNA evidence interpreted using STRmix

Jacobs argues the trial court erred when it failed to hold a *Kelly* hearing before admitting the prosecution's DNA evidence. Jacobs asserts the trial court was required to conduct a *Kelly* hearing because the STRmix methodology of DNA analysis was not generally accepted as reliable in the relevant scientific community. We are not persuaded.

Under *Kelly*, before evidence based on a novel method of scientific proof may be admitted at trial, our Supreme Court requires " 'a preliminary showing of general acceptance of the new technique in the relevant scientific community.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831.) A *Kelly* hearing " 'is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' " (*People v. Daveggio and Michaud*, at p. 831.)

When faced with a novel method of scientific proof, the party seeking to admit the scientific evidence must satisfy "a three-pronged test to establish the reliability of scientific testing and its scientific basis to determine its admissibility." (*People v. Hardy* (2021) 65 Cal.App.5th 312, 325.) "The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. [Citation.] The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. [Citation.] The third prong requires proof that the person performing the test in the particular case used correct scientific

8

procedures." (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545 (*Bolden*).)

Proof of a technique's general acceptance in the relevant scientific community is "no longer [] necessary once a published appellate decision ha[s] affirmed a trial court ruling admitting evidence obtained by that scientific technique, 'at least until new evidence is presented reflecting a change in the attitude of the scientific community.' " (*Bolden, supra,* 29 Cal.4th at p. 545.) "In other words, 'case-by-case adjudication as to the "general acceptance" prong of the *Kelly* test is not required once the scientific technique in question has been endorsed in a published appellate opinion.' " (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 783.)

On appeal, Jacobs only challenges the DNA evidence based on the first prong of *Kelly*, requiring proof that the STRmix method of DNA analysis is generally accepted as reliable in the relevant scientific community. Jacobs's argument is without merit.

"[N]umerous courts across the country have concluded that the STRmix method has gained general acceptance within the relevant scientific community." (*Davis, supra,* 75 Cal.App.5th at p. 717, citing *United States v. Gissantaner* (6th Cir. 2021) 990 F.3d 457, 466 [collecting cases].) Most importantly, however, since Jacobs's trial, another California appellate court has endorsed the STRmix method of DNA analysis, finding it satisfies the first prong of *Kelly*, which ultimately forecloses Jacobs's challenge here. (See *People v. Lazarus, supra,* 238 Cal.App.4th at p. 783.) In *Davis*, the court found "the STRmix method has been subjected to extensive empirical testing and found to be accurate and reliable by the FBI and numerous forensic laboratories."

(*Davis*, at p. 717.) The court noted that the defendant had not directed the court to "any published appellate authority holding that the STRmix method is *not* generally accepted as a reliable method of DNA analysis by the relevant scientific community." (*Id.* at p. 717.) Nor could the defendant point "to any evidence or scientific literature showing that the STRmix method is publicly opposed as unreliable by scientists significant either in number or expertise." (*Ibid.*)

Indeed, in *Davis*, the court rejected the same argument raised by Jacobs here, that a report issued by the National Institute of Standards and Technology (NIST) demonstrated the STRmix method had failed to gain general acceptance in the relevant scientific community. (*Davis*, *supra*, 75 Cal.App.5th at p. 718.) The *Davis* court stated: "Having reviewed the NIST draft report and the additional materials submitted by the Attorney General on the topic, we conclude the NIST Report does not show that the STRmix method has failed to gain general acceptance in the relevant scientific community. Rather, it is largely a thoughtful discussion of the scientific foundation underlying the discipline of DNA mixture interpretation, which seeks to inform future work in the field by documenting and independently assessing the publicly available empirical evidence that supports the reliable use of DNA mixture interpretation methods. [Citation.] The NIST Report does not offer any opinion as to whether STRmix is a reliable method of DNA mixture interpretation. Receipt and careful review of this submission does not alter our conclusion that the STRmix method has indeed gained general acceptance within the relevant scientific community." (*Id.* at pp. 718–719.)

We find *Davis* was correctly decided and reach the same conclusion here—"that the STRmix method of DNA analysis is generally accepted as reliable by the relevant scientific community, such that expert testimony relying on the method satisfied the first requirement of the *Kelly* test." (*Davis, supra,* 75 Cal.App.5th at p. 701.)[2]

While Jacobs acknowledges *Davis*, he argues it is distinguishable on the facts because *Davis* involved the testing of a bloody shoelace rather than an unknown biological source, and there was additional evidence connecting the defendant to the crime. We fail to see the significance of these distinctions. The issue is whether STRmix satisfies the general acceptance test of *Kelly*, not what weight should be afforded to that DNA evidence after it is admitted.

We also reject Jacobs's due process argument as it merely repeats his arguments for excluding the evidence under *Kelly*.

Accordingly, we conclude that the trial court did not err in failing to hold a *Kelly* hearing before admitting the DNA evidence as interpreted by STRmix.

## II. Substantial evidence supports the special-circumstance finding

Jacobs contends the evidence was insufficient to support the jury's robbery-murder special-circumstance finding. Jacobs's contention is belied by the record.

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a

---

[2]     Our Supreme Court denied review in *Davis, supra,* 75 Cal.App.5th on June 1, 2022.

11

reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' "  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*Ibid*.)

To prove the robbery-murder special-circumstance, the People had to show Jacobs committed an attempted robbery, and while attempting to commit the robbery, he killed Alford.  (See *People v. Sakarias* (2000) 22 Cal.4th 596, 618–619.)  Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  "An attempt to commit a crime consists of two elements:  a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  (§ 21a.)

Here, Jacobs argues there was insufficient evidence that he intended to commit a robbery.  Jacobs directs us to the fact that only Woodall heard the gunman say the operative words of a robbery, e.g., "give me the car," while the other passengers heard nothing.  According to Jacobs, Woodall's testimony standing alone, is insufficient as a matter of law to prove intent.

We are not persuaded.  The testimony of only one witness can prove any fact.  (CALCRIM No. 301; see also *People v. Gammage* (1992) 2 Cal.4th 693, 702.)  Here, Woodall's testimony that the gunman stated " 'gimme' " or " 'give me the car' " as he pointed the gun at Alford was sufficient to establish that Jacobs intended to commit a robbery.

Jacobs essentially asks us to reweigh the evidence on appeal and to disregard Woodall's testimony.  As the reviewing court, we can neither reweigh evidence nor reevaluate a witness's credibility.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Accordingly, we find the evidence was sufficient for the jury to find that Jacobs intended to commit a robbery.

## III.  The trial court correctly found section 654 did not apply

Jacobs argues the trial court should have stayed his sentence for possession of a firearm by a felon (§ 29800, subd. (a)(1)) under section 654 because possessing the firearm and Alford's killing were part of an indivisible course of conduct. We disagree.

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (*Ibid*.)  Thus, section 654 " 'precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts.' "  (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 129.)  To determine whether the course of criminal conduct is indivisible, we look to the intent and objective of the defendant. (*Ibid*.)  "[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant

13

may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the actor. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. (*Id*. at pp. 1208–1209.) On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives, which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective, even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Centers* (1999) 73 Cal.App.4th 84, 98.) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, 103 Cal.App.4th at p. 1143.)

14

Relying on *People v. Kane* (1985) 165 Cal.App.3d 480, 488 (*Kane*), Jacobs argues, since he only possessed the weapon purportedly for the instant crime, the acts of possessing the weapon, shooting it, and killing Alford were all part of an indivisible course of conduct.

In *Kane,* the defendant and the victim got into an argument at a bar that "led to fisticuffs." (*Kane, supra,* 165 Cal.App.3d at p. 484.) After the fight, the victim decided to leave and went to his car. (*Ibid.*) As the victim drove away, the defendant pointed his gun at the victim and shot at the victim's car. (*Ibid.*) The defendant was convicted of assault with a deadly weapon, discharging a firearm at an occupied vehicle, and possession of a firearm by a felon. (*Id.* at p. 483.) On appeal, the defendant argued his sentence should have been stayed for discharging a firearm and possession under section 654. (*Kane,* at p. 488.) The People conceded the error, and the appellate court found the trial court should have stayed the sentence. (*Ibid.*)

Since *Kane,* other courts have come to a different conclusion and criticized *Kane* for either failing to address the issue of prior or subsequent possession of the firearm or simply reaching the wrong result on the facts. (See *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412 (*Ratcliff*); *Jones, supra,* 103 Cal.App.4th at pp. 1145–1147.) Both the *Ratcliff* and *Jones* courts concluded section 654 will only bar a separate punishment for the possession of the weapon by a felon if the evidence shows "at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense." (*Ratcliff,* at p. 1412; *Jones,* at pp. 1148–1149.) Given the *Kane* court's lack of analysis, we find the reasoning in *Ratcliff* and *Jones* persuasive and agree with their conclusion that

15

multiple punishments are "proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Jones*, at p. 1144.)

Here, because the evidence showed Jacobs arrived at the scene already in possession of the firearm, and there is no evidence that Jacobs fortuitously came into possession of the firearm at the time of the shooting, we are satisfied that section 654 does not bar his punishment for his possession of a firearm by a felon.

## IV. *Pitchess* review

Jacobs also asked us to independently review the sealed personnel records of Detectives Oscar Valenzuela and Travis Harris in connection with his *Pitchess* motion. Jacobs moved to compel disclosure of any complaints relating to fabrication of evidence, dishonesty, writing of false police reports, planting of evidence and other evidence of misconduct. The trial court granted Jacobs's *Pitchess* motion but found none of the records were discoverable. After reviewing the reporter's transcript and the confidential personnel records, we found no discoverable materials; therefore, we find no abuse of discretion. (*Pitchess v. Superior Court*, *supra*, 11 Cal.3d at pp. 535–540; *People v. Mooc* (2001) 26 Cal.4th 1216, 1232; *People v. Hughes* (2002) 27 Cal.4th 287, 330.)

## DISPOSITION

The judgment is affirmed.


                VIRAMONTES, J.


WE CONCUR:


       STRATTON, P. J.


       WILEY, J.